WISE, Justice.
The remaining defendant below, National Security Fire & Casualty Company (“National Security”), appeals an order of the Mobile Circuit Court certifying a class action.

Facts and Procedural History

The plaintiff, Maurice DeWitt, lived in a mobile home in Theodore. On August 29, 2005, DeWitt’s mobile home and storage shed were damaged during Hurricane Katrina. At the time of the loss, DeWitt had a homeowner’s insurance policy with National Security, and DeWitt filed a claim with National Security regarding the loss. Subsequently, an insurance adjuster with National Security went to DeWitt’s property and prepared an estimate. The estimate stated that the “Actual Cash Value” (“ACV”) of the damage to DeWitt’s home was $8,438.71, the damage to the contents was $568.00, and the damage to his storage shed was $418.59. The total ACV of the damage was $4,425.30, and DeWitt had a $500.00 deductible. Therefore, the adjuster recommended that National Security pay DeWitt $3,925.30. On October 3, 2005, National Security issued a check payable to DeWitt and Green Point Credit[1] for $2,938.71 and two checks payable to De-Witt — one for $418.59 and another for $568.00, for a total of $3,925.30. Subsequently, DeWitt sent a letter to National Security in which he disputed the amount National Security had paid for the loss of his storage shed. National Security prepared a supplemental estimate and, on November 3, 2005, issued an additional check in the amount of $4,001.41 payable to De-Witt.
On July 19, 2007, DeWitt filed a complaint in the Mobile Circuit Court against National Security, National Security Group, Inc., and Omega One Insurance Company (“the defendants”).[2] In his complaint, DeWitt alleged that the defendants had breached his policy of insurance when they did not include in the payment to him 20% for general contractor overhead and profit (“GCOP”) in calculating the ACV of his loss. Specifically, he alleged that, according to the definition of a “actual cash value” in his insurance policy and according to insurance-industry standards, “when it is reasonably foreseeable that the services of a general contractor will be necessary to repair covered property, then ‘actual cash value’ includes not only material and labor costs, but also the standard overhead and profit charged by the general contractor”; that, “Recording to industry standard ... when three or more trade skills (e.g., roofing, sheetrocking, painting) will be needed to repair property, then it is reasonably foreseeable that a general contractor will be employed to accomplish the repair”; that the damage to his mobile home required more than three trade skills to make the repairs; and that, “Recording to [National Security’s] standard practice, [National Security] does not include payment for contractor overhead and profit in its payment of ‘actual cash value’ to its insureds, even when it is reasonably foreseeable that the services of a general *358 contractor will be necessary to repair covered property.” He also sought to represent a proposed class of plaintiffs pursuant to Rule 28(b)(3), Ala. R. Civ. P.
On January 11, 2008, the defendants filed their answer to the complaint and an objection to class certification. In support of their objection, the defendants filed an affidavit of A.W. Shivley, the claims manager for National Security. In his affidavit, Shivley stated:
“3. [DeWitt’s] Complaint in this case requests a review of all estimates regarding overhead and profits for a period of six years immediately preceding the filing of the Complaint. To respond to such a request would be an overly burdensome task for National Security.
“4. Each individual claim file would be required to be pulled and sorted to determine if the file includes any of the information requested by [DeWitt]. This would take a massive amount of time.
“5. Since January 01, 2002 National Security has opened approximately 57,-818 claim files (this includes 3 major hurricanes). We have closed approximately 51,242 claim files and have a current open inventory of 6,576 open claim files. Research into this many files would cause the claims department to cease daily operation for a long period of time.
“6. National Security is located in Elba, Alabama. It is not so large a company that it can afford to dedicate numerous employees solely to a search of client files.
“7. Responding or providing the documentation requested by [DeWitt] would be a great burden on the company.”
On July 13, 2009, National Security Group, Inc., and Omega One Insurance Company filed a motion to dismiss them as defendants, which the trial court granted on August 3, 2009.
On October 1, 2009, DeWitt filed a motion for class certification, defining the class of potential plaintiffs as:
“1) All current and former National Security Fire and Casualty Company insureds;
“2) who are citizens of the State of Alabama;
“3) who in the six years preceding July 19, 2007, suffered a covered loss to property situated within the State of Alabama;
“4) where the damage estimate for such loss prepared by National Security Fire & Casualty Company or its agents indicated repairs by three or more trade skills;
“5) where the loss was settled on an actual cash value basis; and
“6) where the actual cash value payment did not include an amount for general contractor overhead and profit equal to 20% of the underlying cost of repair.”
On March 1, 2010, the trial court conducted a hearing on DeWitt’s class-certification motion. During the hearing, the following portion of Shivley’s deposition was read into evidence:
“[DEWITT’S COUNSEL:] If a homeowner has a loss — and I’m talking about on an actual cash value claim if a homeowner has a loss, when would National Security Fire & Casualty or Omega One pay for general contractor overhead and profit?
“[SHIVLEY:] When the general contractor was involved.
“[DEWITT’S COUNSEL:] The homeowner did not actually involve a general contractor, would ... National Security Fire & Casualty or Omega One pay the general contractor overhead and profit in that case?
*359 “[SHIVLEY:] Each claim is individual and unique and we handle each and every claim on its merit.
“[DEWITT’S COUNSEL:] Okay.
“[SHIVLEY:] Generally, no.
“[DEWITT’S COUNSEL:] Okay. So, generally, ... if the insured did not actually hire a general contractor or employ a general contractor, then that general contractor overhead and profit would not be included in the loss payment. Is that correct?
“[SHIVLEY:] Yes.
“[DEWITT’S COUNSEL:] Okay. When is it the case that when an insured has a loss, if they go out and hire a general contractor, will Omega One or National Security Fire & Casualty always pay the general contractor overhead and profit on every loss that the insured hires a general contractor on?
“[SHIVLEY:] I can’t say every loss but I can’t think of a reason why we wouldn’t. I would say—
“[DEWITT’S COUNSEL:] Okay.
“[SHIVLEY:] — yes, but it’s hard to say—
“[DEWITT’S COUNSEL:] Okay.
“[SHIVLEY:] 110 percent of the time.
“[DEWITT’S COUNSEL:] Sure. Let’s talk about, you know say, you know, a loss where there was just roofing damage, where there was just roof damage involved. If the insured called up a roofer and hired a roofer and that roofer charged overhead and profit above what the estimate called for, you know, for material and labor costs to fix the roof, would y’all pay overhead and profit on that case?
“[SHIVLEY:] Just on a roofer?
“[DEWITT’S COUNSEL:] Correct.
“[SHIVLEY:] No.
“[DEWITT’S COUNSEL:] Okay. If, say, the insured had some roof damage and some vinyl siding damage and then would you pay overhead and profit in that case?
“[SHIVLEY:] Every claim is unique and individual. The adjuster would handle the claim on its merits and he would agree with the insured on the loss and pay it.
“[DEWITT’S COUNSEL:] Okay. If, say, you had and, of course, I was up to two trades there. But let’s say you had a three-trade loss. Let’s say you had a three-trade loss. If, in a three-trade loss, somebody went out and hired a general contractor to fix that loss, would y’all — and by that, I mean. Omega One or National Security Fire & Casualty— pay overhead and profit in that case?
“[SHIVLEY:] Yes.”
DeWitt presented the expert testimony of Albert Stephen Paxton. Paxton testified that “[w]hen three or more unrelated building trades are involved, it’s reasonably foreseeable that coordinating contractor activities are going to be necessary and need to be included in the job — need to be included in the estimate.” He also testified that the Transamerica Insurance Group in California taught him this three-trade rule in 1972. Paxton further testified that he was a licensed contractor in California and that California law provides that a licensed general contractor would be required to perform work that involved a contract of $500 or more and three or more trades. He also testified that he had been taught the three-trade rule by other people; that he had seen the three-trade rule in operation and had read about it throughout his career; and that the three-trade rule was almost universally recognized throughout the United States.
However, on cross-examination, Paxton admitted that the insurance-industry standard, which was applied in Alabama, was *360 to pay GCOP on a case-by-case basis; that it was National Security’s policy, consistent with the insurance-industry standard, to pay GCOP on a case-by-case basis; and that National Security had made the assessment regarding the payment of GCOP in DeWitt’s claim on that basis. He also testified that National Security’s treatment of DeWitt’s claim was consistent with Alabama statutes and Alabama insurance regulations and that National Security did not violate any statute or insurance regulation in processing DeWitt’s claim. He further testified that he believed that the three-trade rule should be the industry standard.
During the class-certification hearing, Shivley testified that National Security does not apply a three-trade rule; that, while he has worked at National Security, it never applied a three-trade rule; that, to his knowledge, no statute or insurance regulation required the application of the three-trade rule; and that no insurance standard in the State of Alabama required the application of a three-trade rule. Shiv-ley further testified that he did not know of any insurance company in Alabama that applied a three-trade rule and that, after this action was filed, he telephoned and checked with several different insurance companies in Alabama and none of those other insurance companies applied a three-trade rule.
Shivley also testified that National Security has been paying GCOP on a case-by-case basis; that National Security does not require the hiring of a general contractor before it pays GCOP; and that it pays GCOP when the use of a general contractor is reasonably foreseeable. During the hearing, the following occurred:
“[DEFENSE COUNSEL:] All right. And we heard earlier from your deposition that you said when [a general contractor is] involved. What do you mean by that?
“[SHIVLEY:] When one has been hired, when one has submitted an estimate, or when the insured says he’s going to use one or when it’s reasonably foreseeable that the insured will use one.
“[DEFENSE COUNSEL:] All right. And is that the standard that you’ve been applying up and to this lawsuit?
“[SHIVLEY:] It’s the standard I’ve been applying my entire career.”
National Security presented two expert witnesses — Thomas Elliott (“Thomas”) and Christopher Elliott (“Christopher”), the president and vice president, respectively, of Elliott Builders, Inc. Thomas testified that Elliott Builders did residential remodeling, catastrophe restoration, historic restoration, single and multifamily residential work, and light commercial work; that it practiced in the Southeast, particularly in Mobile and Baldwin Counties; and that the company was licensed as a general contractor in Alabama, Mississippi, and Florida. Thomas also testified that he did not agree that, when three or more trades are required, the need for a general contractor is reasonably foreseeable; that he did not think that three trades alone was adequate information; that the three-trade rule was an attempt at organization, but it was an artificial organization; that input was needed from someone with the experience to look at the complexity and value of the job to determine if a general contractor’s services are needed; that he could not think of a bright-line rule to be used to determine when a general contractor is necessary; and that he thought that attempting to apply a bright-line rule was a problem because it was artificial and no two jobs are alike. He further testified that factors that should be considered in determining whether a general contractor would be necessary were the complexity of the project, which included technical difficulty; the number of subcontractors or *361 trades that would be required; the value of the contract; and the length of time the project would take. Thomas also testified that he did not typically take on jobs of less than $5,000.
Christopher likewise testified that he did not think that it is reasonably foreseeable that a general contractor would be necessary when three or more trades are involved and that he could not conceive of a bright-line rule that could be mechanically applied to determine whether a general contractor would be required on a job. He also testified that, when determining whether a general contractor was reasonably necessary, one would look at the complexity of the task, the dollar amount of the job, the amount of time that would be required to complete the job, and things of that nature. He also testified that the dollar amount of the job encourages a general contractor to become involved.
On May 17, 2010, the trial court entered an order certifying the class. In that order, the trial court stated, in pertinent part:

“The Policy Language

“The policy provides:
“ ‘Loss Settlement Terms — Subject to the deductible or other limitation that applies, we, pay the lesser of:
“ ‘a) the limit that applies;
“ ‘b) your interest in the property; or
“ ‘c) the amount determined under the Actual Cash Value Terms.
“ T. Actual Cash Value Terms — Actual cash value includes a deduction for depreciation, however caused. The smallest of the following amounts is used in applying the Loss Settlement Terms:
“ ‘a. the cost to repair or replace the property with materials of like kind and quality to the extent practical.
“ ‘b. the actual cash value of the property at the time of loss; or
“ ‘c. (applies only to mobile homes) the difference in the actual cash value just before the loss and the actual cash value just after the loss.’
“National Security paid each putative class member under the Actual Cash Value Terms. These terms embody what National Security’s claims manager described as an industry standard ‘replacement cost less depreciation’ definition of actual cash value. The Court agrees with the caselaw cited in the section below on Commonality that such a definition requires payment for GCOP when [a general contractor] is reasonably foreseeable.

“Rule 23

“The Court turns now to the requirements of Rule 23[, Ala. R. Civ. P.]. In order to certify this case as a class action, the Court must find, and it does find, that the four factors of Rule 23(a) have been met, along with the factors in one of the sections of 23(b), in this case 23(b)(3). Following class discovery, [DeWitt] formally moved for class certification on October 1, 2009.
“The Court held an evidentiary hearing on the motion on March 1, 2010 at which time each side was given the opportunity to present relevant testimony and other evidence. As stated above, after considering the evidence presented along with the subsequent briefing of the parties, the Court finds that the plaintiff has carried his burden of establishing the requisite factors for class certification. Specifically, the Court finds that 1) the class is so numerous that joinder of all members is impracticable; 2) there are questions of law or fact common to the class; 3) the claims or defenses of the representative parties are typical of the claims or defenses of *362 the class; and 4) the representative parties will fairly and adequately protect the interests of the class. Furthermore, the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.
“Ala. R. Civ. P. 23(a)(1) — Numerosity
“[National Security] stipulated on the record at the class certification hearing that the class definition adopted in this order satisfies this requirement for class certification. Under Ala.Code [1975,] § 6-5-641 (e), the court may treat a class certification factor as having been established if the parties have so stipulated on the record, and the court is satisfied that such factor could be proven. Given that the number of affected claims may run into the thousands, the court is satisfied that this factor could be proven. See Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1553 (11th Cir.1986) (as a general rule, classes of more than 40 are deemed to satisfy the numerosity requirement).
“Ala. R. Civ. P. 23(a)(2) — Commonality
“There must be questions of law or fact common to the class. This case presents a mixture of both. The questions of law and fact common to each class member in this case include whether or not GCOP is encompassed within the policy term ‘actual cash value,’ whether a class member may claim GCOP under actual cash value without demonstrating that they actually hired a general contractor, and whether a class member is entitled to GCOP when three or more trades are indicated on National Security’s estimate of their damage. Numerous courts around the country have held that actual cash value includes GCOP when it is reasonably foreseeable that the services of a general contractor will be necessary. See Mills v. Foremost Insurance Co., 511 F.3d 1300 (11th Cir.2008). The issue has not been addressed in Alabama, and it must be decided for each member of the class. Furthermore, if this issue were decided in favor of the class, then the issue of whether general contracting services are reasonably foreseeable when three or more trades are involved would have to be decided.
“[National Security] asserts that the mobile home clause of the Actual Cash Value Terms disrupts the commonality requirement of class certification. ([De-Witt’s] home is a mobile home.) However, National Security’s claims adjuster testified that he had never seen a claim where this provision applied. Therefore, the Court finds that the factor of commonality has been adequately shown.
“Ala. R. Civ. P. 23(a)(3) — Typicality
“[DeWitt] has adequately shown that he is in fact a member of the class as defined below. [DeWitt] is a former National Security insured and a citizen of Alabama. He suffered a loss in the six years prior to July 19, 2007 that was covered by National Security. [De-Witt’s] damage estimate prepared by National Security indicated repairs by three or more trades. [DeWitt] testified that he did not receive GCOP. Furthermore, it is undisputed that the provision excluding certain people from the class does not apply to [DeWitt]. [DeWitt] has not been in previous litigation with National Security regarding his claim, nor has he released its liability for his claim.
“[DeWitt’s] claims for breach of contract stem from National Security’s practice of conditioning the payment of *363 GCOP on the hiring of a general contractor. Both [DeWitt’s] and [National Security’s] experts testified that the standard amount paid for general contractor overhead and profit is 20% of the underlying repair cost. [DeWitt] seeks the same damages for himself as for each class member, that being an additional 20% of the actual cash value of repair costs shown on the class members’ respective National Security damage estimates. Therefore, [DeWitt’s] claims are typical of the class claims, and this factor has been satisfied.
“Ala. R. Civ. P. 23(a) (tí — Adequacy of Representation
“A plaintiff seeking to represent a class must be an adequate representative of the class members’ interests. Factors to consider include whether there is any conflict of interest between the named plaintiff and the putative class members, and whether the attorneys representing the class are qualified, experienced and generally able to conduct the proposed litigation. Cutler v. Orkin Exterminating Co., Inc., 770 So.2d 67, 71 (Ala.2000). The named plaintiff in this case seeks relief identical to the relief sought for each class member, the only variation being the amount calculated from adding 20% to the actual cash value listed on each class member’s estimate.
“[National Security] stipulated that this requirement for class certification has been met, and the Court is satisfied that this requirement could be proven. Furthermore, the Court finds that Maurice DeWitt has no interests antagonistic to [those] of the class, and that he possesses an adequate understanding of the case to assist his attorneys. The Court also finds that he is personally willing and able to represent the class. The Court is familiar with the experience of the class counsel and finds that the class counsel have the experience and resources to conduct the case. The Court notes that the efforts of the attorneys in conducting this case thus far have shown that they are more than able to fully represent the interests of the class members. Therefore, the Court finds that the adequacy of representation factor has been satisfied.
“Ala. R. Civ. P. 23(b)(3) — Predominance of Common Issues Over Individual Issues and Superiority
“As shown above, this case meets all four prerequisites of Ala. R. Civ. P. 28(a). Therefore, a class may be certified if, under Rule 23(b)(8):
“ ‘[T]he court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.’
“The four factors listed above all mitigate in favor of class certification. Relative to factor (A) concerning the interest of class members in bringing separate actions, the amounts due to each class member is relatively small. The Court finds that each class member would have little incentive to take an active part in *364 prosecuting the case. Therefore, given the relatively small amounts due to [De-Witt] and each class member, the litigation costs for a single insured challenging an across-the-board practice of an insurance company would be prohibitively high relative to the relief to which the insured would be entitled.
“As to factor (B) concerning similar litigation, the Court has not been made aware of any class action litigation pending against [National Security] regarding the payment of GCOP in Alabama. As to factor (C), Mobile County is a natural forum for this litigation. The vast majority of the claims involved arose from Hurricanes Ivan and Katrina. The class is limited to Alabama citizens, and the class is limited to losses that occurred in Alabama. Therefore, the Court finds that most of the class members will be residents of either Mobile County or Baldwin County, and the losses concerned are concentrated in these two counties.
“As to factor (D) concerning manageability, National Security maintains an electronic database of its claims files, including each repair estimate prepared by its adjusters during the time period relevant to this case. The relevant estimates would be reviewed to see which ones indicated three or more trades but did not include GCOP. As [DeWitt’s] expert Albert Paxton testified, this is a relatively simple matter of counting. The Court agrees from examining the estimates for [DeWitt] that this is not a complicated task. According to Mr. Paxton, one may also take the list of the terms used to describe the various trades, which [DeWitt] submitted at the hearing, and review an estimate to see if three different trades are listed. Review of the files will also reveal the identity and addresses of the members of the class, so that notice of the class and an opportunity for opt-out may be afforded each class member under Ala. R. Civ. P. 23(c)(2), requiring such notice for any class certified under Rule 23(b)(3).
“Courts in several jurisdictions around the country have held that a case such as this involving the withholding of general contractor overhead and profit from actual cash value was suitable for class certification under versions of Rule 23(b)(3) identical to Alabama’s version. In Burgess v. Farmers Insurance Co., 151 P.3d 92 (Okla.2006), the plaintiffs sought class certification for breach of contract, fraud, and bad faith for failure to add 20% overhead and profit to each actual cash value claim where the estimate showed three or more trades. The trial court certified the class, but the Oklahoma Court of Civil Appeals reversed. However, the Oklahoma Supreme Court reversed the intermediate court and affirmed the trial court’s class certification. The insurance company’s primary argument against class certification was that it evaluated each claim on its own merits, that it did not operate pursuant to an across-the-board pattern, and it denied the validity of measuring the number of trades. Id. at 99-100. The Oklahoma Supreme Court held that denying class certification based on those arguments would inappropriately involve ruling on the merits of the complaint. The court stated that whether the ‘three trade rule’ was valid or not ultimately depended on the jury’s determination. Id. at 100.
“The [United States Court of Appeals for the] Eleventh Circuit has also tacitly approved of class certification of a case similar to this. In Mills v. Foremost Insurance Co., 511 F.3d 1300 (11th Cir.2008), the plaintiffs brought a class action for not paying overhead and profit *365 in actual cash value as well as not paying sales tax. The District Court dismissed the case, holding that the plaintiffs were required to show that they had actually hired a general contractor in order to receive the additional payment. The District Court also held that the case would not be appropriate for class certification, because the individual issue of analyzing each class member’s property damage to see who was entitled to a general contractor would predominate over any common issue.
“The Eleventh Circuit reversed, and held that if it was reasonably likely that the plaintiffs’ repairs would involve a general contractor, then it did not matter under the actual cash value definition (which was substantially the same as the definition given by National Security’s claims manager) whether or not the plaintiffs actually hired a general contractor to be entitled to the additional payment. As to class certification, the Eleventh Circuit noted, and rejected, the insurer’s position that the determination of whether a class member’s damage ‘reasonably required’ the services of a general contractor would necessarily be an individualized issue that prevented 28(b)(8) certification. The court remanded the case to give the plaintiffs a chance to develop through discovery their allegations, nearly identical to this case, that the insurer’s own adjusters had already prepared estimates of each class member’s claim, and that it could be readily determined from the face of the estimates whether or not a general contractor’s services were reasonably likely using methods employed by adjusters everyday. Id. at 1310.
“The Eleventh Circuit stated that it was not expressing an opinion on the appropriateness of class certification. However, by granting class discovery instead of simply affirming the dismissal of the class allegations, the court can only be interpreted as having indicated that individualized issues would not predominate if the plaintiff could show some objective measure that obviated the need to individually assess each class member’s damage. In this case, [De-Witt] has presented the idea of counting the number of trades, the ‘three-trade rule.’ [DeWitt’s] expert explained that once a loss reached the level of complexity where three or more trades were necessary, then the services of a general contractor (and, thus, GCOP) were reasonably foreseeable.
“National Security challenged the use of the three-trade rule at the hearing largely by suggesting that an insured may fortuitously know someone who could perform all of the needed repairs, even in a three-trade situation. One of [National Security’s] experts testified that in a loss such as that sustained by the plaintiff in this case, he would hire such a ‘handyman’ to complete the jobs without paying GCOP. However, the expert admitted that his knowledge of who to call in such a situation was based on his years of experience as a general contractor. However, it was clear from the testimony that for an insured to take advantage of this expert contractor’s knowledge would require the insured to incur the cost of GCOP. Therefore, GCOP would have to be included in the actual cash value payment.
“Furthermore, Rule 23(b)(3) does not require that there be no individualized issues. It only requires that common issues predominate over any individualized issues that may exist. The Court finds that the hypothetical presence of a few extreme examples are not enough to cause individualized issues to predominate over common issues.
*366 “At this stage, the function of the Court is to determine whether [National Security’s] challenge to this rule implicates the need for testimony about every loss, or whether the rule is a reliable tool that can be applied class-wide. The merits of the three-trade rule itself are not at issue at this point. Class certification is a procedural issue distinct from the merits of the case. Ex parte Government Employees Ins. Co., 729 So.2d 299, 303 (Ala.1999). The decision on class certification is not based on a decision about the merits of the class claims. Allstate Ins. Co. v. Ware, 824 So.2d 739, 744 (Ala.2002).
“Courts have held that whether it was improper to withhold 20% overhead and profit from actual cash value where three or more trades were involved is a common issue that predominates over any individualized issues, making class certification appropriate. See Lindquist v. Farmers Insurance Co. of Arizona, [No. CV 06-597-TUC-FRZ] (D.Ariz., February 6, 2008) [not reported in F.Supp.2d]; Melot v. Oklahoma Farm Bureau Mut. Ins. Co., 87 P.3d 644 (Okla.Civ.App, 2003); and Press v. Louisiana Citizens Fair Plan Property Ins. Corp., [12 So.3d 392 (La.Dist.Ct.App.2009) ]. The Court agrees with the reasoning of these cases and finds that the common questions of law and fact in this case predominate over any individualized issues.
“The Court further finds that a class action is a superior method of adjudicating the class members’ claims. As shown above, it would not be economically feasible for each class member to individually litigate his or her claim. Furthermore, the appraisal process offered by National Security is not a superior method either as discussed in the next section[3]
[[Image here]]
“CONCLUSION
“The Court orders that the following class is established:
“1) All current and former National Security Fire & Casualty Company insureds;
“2) who are citizens of the State of Alabama;
“3) who in the six years preceding July 19, 2007, suffered a covered loss to property situated within the State of Alabama;
“4) where the damage estimate for such loss prepared by National Security Fire & Casualty Company or its agents indicated repairs by three or more trade skills;
“5) where the loss was settled on an actual cash value basis; and
“6) where the actual cash value payment did not include an amount for general contractor overhead and profit equal to 20% of the underlying cost of repair.”

Standard of Review

“This Court has stated the standard of review applicable to a class-certification order as follows:
“ ‘This Court reviews a trial court’s class-certification order to determine whether the court exceeded its discretion in entering the order, but we review de novo the question whether the trial court applied the correct legal standard in reaching its decision *367 to certify a class. Compass Bank v. Snow, 823 So.2d 667 (Ala.2001). We will not disturb a trial court’s class-certification order without a showing that in entering the order the court exceeded the permissible limits of its discretion. General Motors Acceptance Corp. v. Dubose, 834 So.2d 67, 70 (Ala.2002).’
“U-Haul Co. of Alabama, Inc. v. Johnson, 893 So.2d 307, 310-11 (Ala.2004).”
Baldwin Mut. Ins. Co. v. Edwards, 63 So.3d 1268, 1271 (Ala.2010).
“The party seeking certification has the burden of proving that it is entitled to class certification. § 6 — 5—[6]41 (e), Ala. Code 1975.
“ ‘[A]n abuse of discretion[4] in certifying a class action may be predicated upon a showing by the party seeking to have the class-certification order set aside that “the party seeking class action certification failed to carry the burden of producing sufficient evidence to satisfy the requirements of Rule 23.” ’
“Compass Bank v. Snow, 823 So.2d 667, 672 (Ala.2001) (quoting Ex parte Green Tree Fin. Corp., 684 So.2d 1302, 1307 (Ala.1996)).”
CIT Commc’n Fin. Corp. v. McFadden, Lyon & Rouse, L.L.C., 37 So.3d 114, 121 (Ala.2009).

Analysis

National Security argues that the trial court erred in finding that DeWitt satisfied his burden of showing that class certification was warranted.
In this case, DeWitt alleged that National Security had engaged in a practice of not paying GCOP on a claim for repairs when the insured did not actually hire a general contractor. In his complaint, De-Witt also alleged that the insurance-industry standard was that when three or more trades would be involved in making the repairs it was reasonably foreseeable that a general contractor would be necessary and GCOP should be paid. However, National Security alleged that its policy was to pay GCOP when it was reasonably foreseeable that a general contractor would be necessary, regardless of whether a general contractor was actually hired and without application of the three-trade rule. It also asserted that it made such a determination on a case-by-case basis and that it was the insurance-industry standard in Alabama to pay GCOP on a case-by-case basis.
Rule 23, Ala. R. Civ. P., provides:
“(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
“(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
“(1) the prosecution of separate actions by or against individual members of the class would create a risk of
“(A) inconsistent or varying adjudications with respect to individual members of the class which would es *368 tablish incompatible standards of conduct for the party opposing the class, or
“(B) adjudications with respect to individual members of the class which would as a practical matter be disposi-tive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
“(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
“(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.”
Further, in CIT Communication Finance Corp., supra, this Court stated:
“ ‘ “[CJlass actions may not be approved lightly and ... the determination of whether the prerequisites of Rule 23 have been satisfied requires a ‘rigorous analysis.’” Ex parte Citicorp Acceptance Co., 715 So.2d 199, 203 (Ala.1997); see also § 6-5-641, Ala.Code 1975. The plaintiff must offer sufficient evidence of the Rule 23 criteria; this evidence must be referenced in the trial court’s order before class certification is proper.’
“Bill Heard Chevrolet Co. v. Thomas, 819 So.2d 34, 40 (Ala.2001).”
37 So.3d at 121. Further, in Wyeth, Inc. v. Blue Cross & Blue Shield of Alabama, 42 So.3d 1216, 1221-22 (Ala.2010), this Court stated:
“ ‘A Rule 23 determination is wholly procedural and has nothing to do with whether a plaintiff will ultimately prevail. ...’ Little Caesar Enters., Inc. v. Smith, 172 F.R.D. 236, 241 (E.D.Mich.1997) (comment on Rule 23, Fed.R.Civ. P.). We also note that, in examining the several prerequisites for class certification contained in Rule 23, it should be kept in mind that ‘Alabama’s Rule 23 and the corresponding federal rule (Rule 23, Fed.R.Civ.P.) are “virtually identical,” ... and “[fjederal authorities are persuasive when [a court is] interpreting the Alabama Rules of Civil Procedure.” ’ Mitchell v. H & R Block, Inc., 783 So.2d 812, 816 (Ala.2000) (quoting Marshall Durbin & Co. v. Jasper Utils. Bd., 437 So.2d 1014, 1025 (Ala.1983), and Rowan v. First Bank of Boaz, 476 So.2d 44, 46 (Ala.1985)).
“ ‘The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met.’ Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Group L.P., 247 F.R.D. 156, 164 (C.D.Cal.2007). BCBSAL seeks certification under Rule 23(b)(3), Ala. R. Civ. P. We have previously noted that ‘[a] number of these criteria, such as the Rule 23(a) requirements of commonality and typicality and the Rule 23(b)(3) requirement of predominance, are analytically similar.’ Avis *369 Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1116 (Ala.2003) (citing Heartland Commc’ns, Inc. v. Sprint Corp., 161 F.R.D. 111, 117 (D.Kan.1995)).”
In this case, DeWitt sought class certification pursuant to Rule 23(b)(8), Ala. R. Civ. P.
A. Predominance
National Security’s most significant argument is that the proposed class action does not satisfy the requirement that issues common to the class predominate over individual issues.
“We have stated that ‘[i]n determining whether the questions of law or fact common to the class members predominate over those questions that affect only individual class members, the court must initially identify the substantive law applicable to the case and identify the proof that will be necessary to establish the claim.’ Ex parte Green Tree Fin. Corp., 723 So.2d 6, 9 (Ala.1998). The standard lease agreement used in this case provides: ‘[T]his lease will be governed by the laws of the State of New Jersey.’ Therefore, the same substantive law will apply to all the claims.... As we have previously discussed, we do not find any ambiguity in the terms of the standard lease agreement, and CIT’s methods of administering the insurance programs and assessing fees were the same for each class member. Therefore, there will be no need for individualized proof as to either of those matters.
“CIT also argues that McFadden cannot demonstrate a predominance of common issues of law and fact, because the calculation of damages will require individualized evidence, and McFadden has not presented the trial court with a class-wide method of determining damages. However, as the United States Court of Appeals for the First Circuit noted in Smilow v. Southwestern Bell Mobile Systems, 323 F.3d 32, 40 (1st Cir.2003), ‘[t]he individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where ... common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.’ ...”
CIT Communication, 37 So.3d at 126-27 (footnote omitted).
“ ‘As noted above, Rule 23(b)(3) requires a finding that “questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” This requirement “ ‘tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.’ ” Reynolds Metals [Co. v. Hill], 825 So.2d [100] at 104 [ (Ala.2002) ] (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). In making this determination, “[cjourts examine the substantive law applicable to the claims and determine whether the plaintiffs presented sufficient proof that common questions of law or fact predominate over individual claims.” Voyager Ins. Cos. v. Whitson, 867 So.2d 1065, 1071 (Ala.2003). “When individual issues predominate over the common claims, manageability of the action as a class is not possible.” Voyager Ins., 867 So.2d at 1077. Therefore, this Court must determine whether [the plaintiffs] presented sufficient evidence that common questions of law or fact *370 predominate over individual issues as to each of [the plaintiffs’] claims.’
“University Fed. Credit Union v. Grayson, 878 So.2d 280, 285-86 (Ala.2003).
[[Image here]]
“This Court has explained:
“ ‘In determining whether the questions of law or fact common to the class members predominate over those questions that affect only individual class members, the court must initially identify the substantive law applicable to the case and identify the proof that will be necessary to establish the claim. Alabama v. Blue Bird Body Co., 573 F.2d 309, 316 (5th Cir.1978). This consideration is particularly important in cases where one or more of the claims will require proof of subjective factors.... ’
“Ex parte Green Tree Fin. Corp., 723 So.2d 6, 9 (Ala.1998).
“ We have held that the necessity of individualized testimonies from each class member to prove an essential element of the cause of action defeats class certification. Reynolds Metals Co. v. Hill, 825 So.2d 100 (Ala.2002); Compass Bank v. Snow, [823 So.2d 667 (Ala.2001) ].’
“Smart Prof'l Photocopy Corp. v. Childers-Sims, 850 So.2d 1245, 1249 (Ala.2002).
“ ‘The mandate to identify the “substantive law applicable to the case” requires more than a simple statement of which state’s law governs; the trial court is required to identify the elements of the claims to be certified and to discuss, in the context of the class-certification criteria, the proof the plaintiffs must present to establish each of those elements. It is only by specifically discussing the elements of each claim in the context of the Rule 23 criteria that the trial court may determine whether the plaintiffs can establish the Rule 23(a) and 23(b) elements of class certification. See e.g., Mann [v. GTE Mobilnet of Birmingham Inc., 730 So.2d 150, 152 (Ala.1999) ]; Ex parte Green Tree Fin. Corp., 723 So.2d 6 [ (Ala.1998) ].’`
“Bill Heard Chevrolet Co. v. Thomas, 819 So.2d 34, 41-42 (Ala.2001).
“In connection with the plaintiffs’ burden to demonstrate that class certification is proper, ‘[t]he trial court may not merely rely on assurances of counsel that any problems with predominance or superiority ... can be overcome.’ Ex parte Green Tree Fin. Corp., 723 So.2d at 10. ‘ “If serious manageability problems exist, it is no answer to say that they will be resolved later in some unexplained or uncertain manner.” ’ Compass Bank v. Snow, 823 So.2d 667, 675 (Ala.2001) (quoting with approval an unpublished order issued by a federal district judge in a case involving claims virtually identical to those asserted in Snow).”
Houston County Health Care Auth. v. Williams, 961 So.2d 795, 804-05 (Ala.2006).
In this case, DeWitt alleges that National Security breached its insurance contracts when it did not include payments for GCOP to insureds whose estimates reflected that three or more trades were involved in the covered repairs and who did not hire a general contractor. DeWitt argued that the following questions of law and fact were common to all class members:
“1) whether or not ‘actual cash value’ as defined in the policy includes general contractor overhead and profit when it is reasonably foreseeable at the time of loss settlement that the services of a *371 general contractor will be necessary to accomplish the loss; 2) whether or not it is reasonably foreseeable that the services of a general contractor will be necessary to accomplish repair of the loss when the skills of three or more trades are estimated to be necessary to repair the loss; and 3) whether or not it is a breach of the policy for [National Security] to omit general contractor overhead and profit from its actual cash value payments.”
“In order to establish a breach-of-contract claim, a plaintiff must show ‘(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant’s nonperformance, and (4) damages.’ Southern Med. Health Sys., Inc. v. Vaughn, 669 So.2d 98, 99 (Ala.1995) (citations omitted).” Ex parte Alfa Mut. Ins. Co., 799 So.2d 957, 962 (Ala.2001). The pivotal issue in this case is the alleged nonperformance by National Security. National Security concedes that ACV includes payments for GCOP when it is reasonably foreseeable that the services of a general contractor will be necessary to accomplish the covered repairs. Therefore, that is not an actual issue in this case. The first common issue in this case is whether National Security engaged in a pattern and practice of not including payments for GCOP unless a general contractor was actually hired. However, the overriding common issue in this case is whether it was reasonably foreseeable that a general contractor was necessary to complete the repairs in each of the putative class members’ claims so that National Security breached its contract by not paying GCOP. Finally, the next common issue is whether the three-trade rule should be applied to determine whether it was reasonably foreseeable that a general contractor was necessary to complete the repairs.
Alabama courts have not addressed predominance with regard to the certification of a class of insureds who argue that an insurance company improperly failed to pay GCOP when the insureds’ estimates indicated that three or more trades would be necessary to make the repairs.[5] However, in John v. National Security Fire & Casualty Co. (No. 06-1407, Feb. 12, 2008) (W.D.La.2008) (not reported in F.Supp.2d), an unpublished memorandum, the United States District Court for the Western District of Louisiana addressed the appropriateness of class certification for a similar claim. In John, the district court refused to certify a class of insureds whose claims “ %dicate[d] the involvement of more than two trades’ ” and who were not paid GCOP. The district court stated:
“National Security maintains that the class allegations must be stricken because individual facts predominate against any common issues which may be present[;] therefore Plaintiffs have failed to state a claim upon which the requested relief can be granted. National Security also maintains that Plaintiffs have stated no cause of action for automatic ‘overhead and profit’ payments under Louisiana law. The Court agrees.
“A complaint that gives a ‘bare bones’ allegation that a wrong occurred and does not plead any of the facts giving rise to the injury, does not provide adequate notice. In their class allegations, Plaintiffs make the conclusory allegation *372 that if- a claim requires more than two trades, they are automatically entitled to a general contractor resulting in 20% overhead and profit. The complaints, as amended, allege no facts that would demonstrate the need for a general contractor, nor do they allege any contractual provision that automatically entitles Plaintiffs to a general contractor. This Court finds that a case by case factual inquiry would have to be made regarding the type, nature and complexity of the necessary repairs before it can be determined if a general contractor is warranted. Such an individualized inquiry would necessarily prevent this type of claim from being certified as a class.”
(Footnote omitted.)
In Nguyen v. St. Paul Travelers Insurance Co. (No. 06-4130, Oct. 6, 2008) (E.D.La.2008) (not reported in F.Supp.2d), another unpublished order, the United States District Court for the Eastern District of Louisiana addressed the appropriateness of class certification for a similar claim. In Nguyen, the plaintiffs argued that, in adjusting their claims, Standard Fire Insurance Company (“Standard Fire”)[6] determined that the repair of their property would require more than three trades and that Standard Fire breached its insurance contract with the plaintiffs when it did not include GCOP in payment of their claims. The plaintiffs also sought class - certification. Standard Fire moved to dismiss the amended complaints and to strike the class allegations. In addressing the motion to dismiss the plaintiffs’ breach-of-contract claim, the district court stated:
“Plaintiffs’ insurance policy provides that Standard Fire ‘will pay no more than the actual cash value of the damage until actual repair or replacement is complete.’ (See Ins. Policy, R. Doc. 302-2 at 16 of 37.) Plaintiffs allege that they were entitled under the loss provision of their insurance policy to receive the actual cash value of their damaged property. They further claim that when defendant settled with them on an actual cash value basis, it did not pay them the complete actual cash value, because defendant did not include GCO & P. Accordingly, plaintiffs allege that defendant violated the terms of the insurance policy.
“The plaintiffs are correct that pursuant to the terms of their homeowner’s policy, they are entitled to payment of the actual cash value of their property before any repairs or replacement take place, and regardless if such measures are never taken....
“Replacement costs include the costs necessary to repair or replace the property. Although there is no Louisiana law on the payment of GCO & P as part of an ACV payment, numerous other jurisdictions have held that an insurer is required to include GCO & P in an ACV payment when it determines that an insured is reasonably likely to require the services of a general contractor to repair covered property damage.... These [cited] cases hold that it is a breach of the insurance contract to fail to pay overhead and profit as part of an ACV or upfront RC [replacement cost] payment when the insured is reasonably likely to require the services of a general contractor to repair covered property damage.
“Plaintiffs nevertheless aver, citing industry standards and custom, as well as Melot v. Oklahoma Farm Bureau Mut. *373 Ins. Co., 87 P.3d 644 (Okla.Civ.App. Div. 4 2003),[3] that defendant is required as a matter of contract to include GCO & P in actual cash value payments whenever its estimate reflects that three or more trades are necessary to perform the insured’s repairs. (See Amend. Compl. ¶ 10) (‘It is both legally accepted, and the clear custom and practice in the insurance industry to include general contractor overhead and profit in the ACV or upfront payment as, “a cost reasonably expected to be incurred” when defendant’s adjustment of covered damages indicates the involvement of three or more trades necessary to perform repairs’.) The Court does not find that as a matter of Louisiana law, Standard Fire is required to include GCO & P as part of an ACV or upfront RC payment whenever it determines that three or more trades are needed to repair the insured’s damaged property. Plaintiffs have pointed to no such law in Louisiana supporting their ‘three or more trades rule,’ and the Court has found none.
[[Image here]]
“... Accordingly, the Court does not read into defendant’s contract a requirement that defendant pay general contractor overhead and profit whenever three trades are required for repairs.

“Although the Court does not find that the ‘three-trade rule’ applies as a matter of law in Louisiana, plaintiffs are entitled to introduce as evidence that because their covered damages required three or more trades, they were entitled to a payment of GCO & P as part of their ACV payment because it was a cost reasonably expected to be incurred in repairing or replacing the covered loss.

[[Image here]]
(Some footnotes omitted.)
With regard to Standard Fire’s motion to strike the class allegations, the district court stated:
“To be certified, a class must first satisfy the threshold requirements of Rule 23(a), including numerosity, commonality, typicality, and adequacy of representation, and then satisfy Rule 23(b)(3)’s two prerequisites of predominance and superiority. Here, the parties mainly contest whether plaintifffs] can show that questions of law or fact common to the class members predominate over questions affecting only individual members. Accordingly, the Court addresses the issue of predominance first.
“To predominate, ‘common issues must constitute a significant part of the individual cases.’ Mullen[ v. Treasure Chest Casino, LLC], 186 F.3d [620] at 626 [ (5th Cir.1999) ]. ‘This requirement, although reminiscent of the commonality requirement of Rule 23(a), is “far more demanding” because it “tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.” ’ Unger[ v. Amedisys, Inc.], 401 F.3d [316] at 320 [ (5th Cir.2005)] (quoting Amchem Prods.[, Inc. v. Windsor], 521 U.S. [591] at 623-24 [ (1997) ]). The Court finds that individual issues predominate over questions of law or fact common to the putative class, and therefore strikes plaintiffs’ class allegations.
“As discussed above, plaintiffs allege that Standard Fire breached their insurance contract. The substantive issues that will control the outcome of the case *374 include the facts necessary to determine whether Standard Fire met its contractual obligations to plaintiffs, and therefore to the class. Plaintiffs’ policy contains a Loss Settlement provision which provides in relevant part:
“ “We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete we will settle the loss according to the provisions of b.(l) and b.(2) above.’
“(Ins. Policy, R. Doc. 302-2 at 16 of 37.) When an insured makes a claim on an actual cash value basis, defendant is required to include GCO & P in the ACV payment when the services of a general contractor are reasonably likely to be required. See, e.g., Mills[ v. Foremost Ins. Co.], 511 F.3d [1300] at 1305-06 [ (11th Cir.2008) ]; Parkway Associates[, LLC v. Harleysville Mut. Ins. Co.], 129 Fed.Appx. [955] at 963 [ (6th Cir.2005) ] [not selected for publication in the Federal Reporter].
“Plaintiffs allege that every time Standard Fire determines that an insured’s damages require the services of three or more trades to repair, the insured is entitled to GCO & P, and therefore individual issues of law or fact do not predominate. The Court finds that plaintiffs can allege that because an insured required the services of three or more trades, that is evidence that she or he was reasonably likely to require the services of a general contractor, and therefore defendant’s failure to include GCO & P in their adjustment was a breach of contract. Although plaintiffs’ proof might be simple and compelling, they fail to point out any law that would permit the Court to then foreclose the defendant from showing in an individual case that the insured was not reasonably likely to require the services of a general contractor, and therefore was not underpaid its ACV payment.
“Whether the nature of an insured’s damages indicates that he or she is reasonably likely to require the services of a general contractor is a factual question, requiring individualized assessments. Accordingly, there is no ‘class-wide proof available’ to decide whether the nature of each insured’s damages were such that the insured was reasonably likely to require the services of a general contractor. See, e.g., Gene And Gene LLC v. Biopay LLC, 541 F.3d 318 (5th Cir.2008). Standard Fire proffers the following example. In a case where the insured suffered roof damage during Hurricane Katrina, the damage might require roof repairs, repairs to ceiling panels, and repairs to carpet damage. This indicates that three separate trades would be required, including a roofer, handyman, and carpet company. Standard Fire contends that an insured would not require a general contractor to coordinate this work. On the other hand, extensive damage to the roof of a large commercial building might be the type of job that would require roofers alone, but would still require the supervision of a general contractor because of the complexity and scope of the work. The determination of whether the services of a general contractor would be reasonably likely to be required in these two examples is a fact question, that will be different for every insured. This kind of case-by-case determination is inappropriate for class treatment. See John v. Nat’l Sec. Fire & Cas. Co., [No. 06-1407, Feb. 12, 2008] (W.D.La.2008) [not reported in F.Supp.2d] (‘This Court finds that a case by case factual inquiry would have to be made regarding the type, nature and complexity of the necessary repairs before it can be deter *375 mined if a general contractor is warranted. Such an individualized inquiry would necessarily prevent this type of claim from being certified as a class.’); see also Mills, 511 F.3d at 1306 (finding that plaintiffs ‘would not be entitled to receive payment for any type of cost charged by a general contractor without showing that they would be reasonably likely to need a general contractor for the repairs in issue.’); Mee[ v. Safeco Ins. Co. of America ], 908 A.2d [344] at 350 [ (Pa.Super.2006) ] (‘whether use of a general contractor is reasonably likely depends on the nature and extent of the damage and the number of trades needed to make repairs. This last principle necessarily requires consideration of the degree of coordination or supervision of trades required to make the repairs.’).”
In Mills v. Foremost Insurance Co., 511 F.3d 1300 (11th Cir.2008), the Millses, Florida residents whose mobile home was damaged during Hurricane Frances in 2004, filed a class-action complaint in a Florida state court alleging that Foremost had breached the terms of its insurance policy by not including GCOP and sales taxes in the payment for the loss and that Foremost had unlawfully failed to inform the Millses, either before they purchased or renewed their policy, that Foremost did not intend to pay GCOP or sales taxes on any property losses. Foremost removed the case to federal court and filed a Rule 12(b)(6), Fed.R.Civ.P., motion to dismiss, arguing that class-action treatment was not appropriate because common legal or factual issues would not predominate over individual issues. On November 15, 2006, the district court granted Foremost’s Rule 12(b)(6) motion and held that class certification was not appropriate because individual issues would predominate over common questions of law and fact. The Millses appealed.
On appeal, the United States Court of Appeals for the Eleventh Circuit held that, under the policy, “making the actual repairs first is not required in order to be paid actual cash value of the damaged property” and that GCOP would be included in the “ ‘cost to repair or replace.’ ” 511 F.3d at 1305. It also held that “[t]he Millses would not be entitled to receive payment for any type of cost charged by a general contractor without showing that they would be reasonably likely to need a general contractor for the repairs in issue.” 511 F.3d at 1306. Therefore, it held that the district court had improperly granted Foremost’s motion to dismiss. With regard to class-action suitability, the Eleventh Circuit noted that, in their complaint, the Millses had alleged that they qualified as class representatives pursuant to each of the three grounds set forth in Rule 23(b), Fed.R.Civ.P., but the district court had addressed only the predominance ground set forth in Rule 23(b)(3). It also held that the district court’s determination that individual issues would predominate over common questions of law and fact, based solely on the pleadings, was premature. Specifically, it noted:
“[W]e conclude only that the district court erred in determining that class action treatment was inappropriate as a matter of law from the face of the Mills-es’ particular complaint, and we remand for further proceedings. In so holding, we express no opinion as to whether class certification is or is not appropriate in this case.”
511 F.3d at 1309-11 (emphasis added).
On remand, the district court conducted an in-depth examination into all the Rule 23(a) and Rule 23(b), Fed.R.Civ.P., prerequisites regarding class certification. See *376 Mills v. Foremost Ins. Co., 269 F.R.D. 663 (M.D.Fla.2010). The district court stated:
“The Millses maintain that each individual within the proposed class definition was a Foremost insured who suffered a covered loss to his or her mobile home and, according to the estimates prepared by Foremost, the identified repairs reasonably required the services of a general contractor based upon the fact that each repair required the utilization of three or more trades. Thus, the Millses seek to recover an allowance for GCOP that was not paid by Foremost for the damage to their covered mobile home as a result of the 2004 Florida Hurricanes. The Millses basis for such an allowance is that the custom and practice in the insurance industry in Florida, and the rest of the United States at the time plaintiffs and each class member’s claim was adjusted and paid by Foremost, was to include ten percent (10%) overhead and ten percent (10%) profit in the insurer’s estimates on all claims in which three or more trades were used to complete repairs. This is what the Millses refer to as a ‘three trades rule.’ It is undisputed that a ‘three trades rule’ does not expressly appear in the insurance policy language. Instead, the Millses advance a ‘three trades rule’ theory of liability on the basis that expert witnesses’ depositions and testimony establish that it is the custom and practice within the insurance industry to pay GCOP where the estimate shows three trades or more are required to complete the repairs.”
269 F.R.D. at 668-69.
The district court then addressed the predominance and superiority requirements set forth in Rule 23(b)(3), Fed. R.Civ.P., as follows:
“a. Predominance
“The essential consideration in weighing predominance for Rule 23(b)(3) certification is whether the individual plaintiffs will need to introduce individualized evidence or advance individualized legal arguments in order to establish ‘most or all of the element[s] of their individual claims,’ in which case certification is inappropriate. Vega[ v. T-Mobile USA, Inc.], 564 F.3d [1256] at 1257 [(11th Cir.2009) ] (quoting Klay[ v. Humana, Inc.], 382 F.3d [1241] at 1255 [(11th Cir.2004) ]). More specifically, in determining whether a proposed class meets the requirements for predominance, ‘a district court must examine not only the defendant’s course of conduct towards the class members, but also the class members’ legal rights and duties.’ Sacred Heart Health Sys. v. Humana Mil. Healthcare Servs., 601 F.3d 1159, 1170 (11th Cir.2010).
“In the case of a Rule 23(b)(3) certification motion based upon a breach of contract, it is well to remember that ‘claims for breach of contract are peculiarly driven by the terms of the parties’ agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contracts.’ Sacred Heart Health Sys., 601 F.3d at 1171. Even the existence of a form contract, however, ‘do[es] not guarantee predominance if individualized extrinsic evidence bears heavily on the interpretation of the class members’ agreements,’ such as when ‘a defendant raises substantial affirmative defenses to breach.’ Id. at 1176-1177. Moreover, if damages across the class cannot be computed by ‘some formula, statistical analysis, or other easy or essentially mechanical method[ ],’ that too may be sufficient to preclude a finding of predominance. Id. at 1179.
“On appeal in Mills, the Eleventh Circuit established a clear standard in *377 which GCOP was to be paid, that is, in circumstances where the policyholder would be reasonably likely to need a general contractor in repairing or replacing of their damaged property. Mills at 1306. Thus, in order to determine whether or not a policy holder is entitled to the withheld payments, it is likely that the putative class plaintiffs will need to introduce evidence specific to their claim in order to argue that the use of a general contractor was[,] indeed, reasonably likely. As the Eleventh Circuit has not established a ‘three trade rule’ standard as the Millses have averred, the likelihood that a putative class member plaintiff will need to argue what was reasonable under the circumstances given his or her specific claim, creates a lack of predominance in the present action as that argument may be different from a fellow putative class member.
“Furthermore, as Foremost has pointed out, there exist defenses to liability that will be raised on an individual basis. Some of the possible defenses to be raised may be overpayment of a claim by Foremost regarding a particular claimant, or fraud by the claimant in regard to their claim for property damages as a result of the 2004 Florida Hurricanes, or whether the appraisal provision within the policy was invoked, or whether a claim was a total loss in which policy limits would have been paid by Foremost and the homeowner would purchase a replacement mobile home as compared to repairing their previous mobile home. In addition to the potentially individualized defenses that may be raised, there exists a concern from this Court as to how a reasonably likely standard will be able to be determined on a class-wide basis. While the Millses advance a ‘three trades rule’ in order to determine whether or not a general contractor was reasonably likely to be needed, this Court finds issue with such a rule. Even if a ‘three trades rule’ were to be employed as the standard in the instant case, the application of such a rule still does not fully answer the question of whether or not a general contractor being needed was reasonably likely.
“Potentially, one putative class member plaintiff may argue that it was reasonable under the circumstances that a general contractor would have been needed to repair or replace their covered mobile home from damage caused by the 2004 Florida Hurricanes because three or more trades were needed, and under the custom and practice within the insurance industry, the ‘three trades rule[ ]’ applies. This is precisely the argument raised by the Millses. A fellow class member plaintiff, who also suffered damage as a result of the 2004 Hurricanes, may argue that it was reasonably likely a general contractor would have been needed to repair or replace his or her covered loss because, although only one trade was needed, the extent of the damage was severe and complex thus making it reasonably likely a general contractor would be needed. Keeping with the hypothetical, the first class member claimant would receive GCOP under the Millses’ ‘three trades rule’ while the second hypothetical class member claimant would not receive GCOP. While it may have been reasonably likely under the circumstances that a general contractor would be needed to repair or replace the second class member’s covered mobile home, due to extensive damage within one trade, based on the second hypothetical class member plaintiff; lack of the trades required under a ‘three trades rule’ for payment of GCOP, there is no payment of GCOP. Thus, even though the second class *378 member plaintiffs extensive damage made it reasonably likely under the circumstance that a general contractor would be required to repair or replace the damaged mobile home: the second claimant would none the less not be entitled to GCOP under a ‘three trades rule.’ Even if the second claimant had damage requiring two trades, there would still be no payment under the ‘three trades rule’, while it quite possibly could have been reasonable under the circumstances that a general contractor would be required. The above example provides as an illustration of how the use of a ‘three trades rule’ will still leave the question of whether a general contractor was reasonably likely to be needed in the repair or replacement of a class member’s damaged mobile home in the balance, and if a ‘three trades rule’ were to be followed, then predominance certainly does not exist as the above example demonstrates. For the interests of the first hypothetical class member and the interests of the second hypothetical class member diverge.
“Moreover, if damages across the class cannot be computed by ‘some formula, statistical analysis, or other easy or essentially mechanical method[ ],’ that too may be sufficient to preclude a finding of predominance. Sacred Heart, at 1179. In the instant case, the raising of individualized defenses, in addition to the likely claim by claim file review, shows a lack of predominance. In essence, one putative class member will face an asserted defense by Foremost that the loss payment issued to the insured was in excess while another putative class member will face the defense that the insured fraudulently submitted their claim, while another will face the defense that because the mobile home was a total loss a general contractor was never needed. In light of such a scenario, the putative class members[,] while having similar interests, would both need to set forth separate and distinct extrinsic evidence in order to refute the defenses raised by Foremost. Such individualized proof leads this Court to find the lack of predominance in the instant case.
“It should be noted that several courts have reached the same conclusion, that is, post-hurricane claim adjustments are not appropriate for class treatment due to the individualized facts of each claim....
“b. Superiority and Manageability
“If the district court does not find that the predominance requirement is met, it must still inquire as to the second prong of Rule 23(b)(3) — namely whether ‘a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.’ Fed.R.Civ.P. 23(b)(3). The superiority inquiry will ultimately consist of the court determining whether a class action is an efficient and manageable method of dispensing with the issues to be litigated, and a comparison of the burdens of a class-action suit with those that would obtain if the court required class-members to pursue their claims individually. However, the predominance analysis has ‘a tremendous impact on the superiority analysis ... for the simple reason that, the more common issues predominate over individualized issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiffs’ claims.’ Williams[ v. Mohawk Indus., Inc.], 568 F.3d [1350] at 1358 [(11th Cir.2009) ] (Klay[ v. Humana, Inc.], 382 F.3d [1241] at 1269 [ (11th. Cir.2004) ]). In this way, if a district court finds ‘that issues common to all class members predominate over individual issues, then a class action will likely be more managea *379 ble than and superior to individual actions.’ Id. In the end, a finding of superiority will not compensate for a lack of predominance, and the existence of problems with regard to manageability can only scuttle an otherwise proper motion for certification after predominance has already been shown. Sacred Heart Health Sys., 601 F.3d at 1184 (quoting Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 617, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)). This Court has grave concerns regarding the manageability of this suit as a class action, specifically the claim by claim review that will undoubtedly be needed.
“In Gibbs Properties Corp. v. Cigna Corp., 196 F.R.D. 430, 433 (M.D.Fla.2000), Plaintiffs were three Florida corporations which purchased various commercial insurance packages from Defendants Cigna Fire Underwriters Insurance Co. (‘Cigna Fire’), Bankers Standard Insurance Company (‘Bankers’), Insurance Company of North America (TNA’), and Pacific Employers Insurance Company (‘Pacific’), insurance companies which are all owned by Defendant Cigna Corporation. The crux of Plaintiffs’ Complaint was that Defendants purported to sell insurance to Plaintiffs in accordance with rates and schedules filed with the Florida Department of Insurance (‘FDOI’) but, in fact, instituted various policies and procedures whereby Defendants would illegally and improperly inflate the premiums and collect such excessive premiums. Id. Defendants claimed that individual ‘mini-trials’ would be necessary for each class member in order to determine damages. Id. at 441. Plaintiffs countered by arguing that their class certification expert anticipated being able to use a formula in order to calculate damages for the class. Nevertheless, the court found that materials submitted by the named Plaintiffs showed that the amount of damages, if any, varied from class member to class member. Id. Because the Court would have to analyze each individual class member’s underwriting file in order to calculate damages, the Gibbs Court ultimately found that such a task makes management of a class action suit unworkable as it pertains to damages. The motion for class certification in Gibbs was denied. Id. at 443.
“In the instant case, such an individualized examination of each policy holder’s estimate would also be required. Foremost expressed such a concern in their motion opposing class certification by arguing that certification would ultimately result in seventeen thousand and three hundred (17,300) mini-trials. (Dkt. 190 P. 33) The Millses’ purported expert witness, Kermith Sonnier, himself had to examine, file by file, each claim in order to estimate the number of potential class members....
[[Image here]]
“... [T]he court in determining manageability should consider the potential difficulties in notifying class members of the suit, calculation of individual damages, and distribution of damages. Maguire v. Sandy Mac, Inc., 145 F.R.D. 50 (D.N.J.1992). Thus, even assuming this Court would apply a ‘three trades rule,’ the calculation of damages is not readily apparent and applying the Eleventh Circuit reasonably likely standard will surely only make the calculation of damages more difficult as individual inquiries for each claimant must be made in order to determine what was reasonably likely under the circumstances....
“Furthermore, Foremost may raise defenses that are founded on an individual basis, as their motion opposing class *380 certification indicates. Therefore, taking the Millses’ allegations and reasoning as true, that the payment of GCOP is easily calculated by multiplying the actual cash payment by the going rate for GCOP, twenty percent (20%), problems still abound. As GCOP would be calculated as a percentage of the actual cash value payment made to the class members, GCOP cannot be viewed distinct from all other decisions that comprised the determination of Foremost not to pay GCOP. The Millses’ supplemental claims provide an excellent example. The Millses filed two (2) additional claims for damage to their home resulting from the 2004 Florida Hurricanes and Foremost would be entitled to introduce evidence regarding the calculation of GCOP given the supplemental claims. The possibility that the supplemental claims paid by Foremost include sufficient funds for the hire of a general contractor in the repair or replacement of the insureds home remains a quite viable defense, and one that can only be determined on an individual basis, and only through claim by claim analysis.”
269 F.R.D. 675-80.
Some of the same concerns regarding predominance raised in the unpublished decisions of the federal district courts in Louisiana in John and Nguyen and in the decision of the federal district court in Florida in Mills are present in this case.[7]
This case will likely involve the introduction of evidence regarding many of the individual claims of the class members. The three-trade rule is simple and can be applied in this case mechanically. However, DeWitt has not cited, and we have not found, any Alabama statutes, regulations, or caselaw that requires the application of a three-trade rule.[8] Also, he has not cited any statute, rule, or caselaw that would prevent National Security from presenting evidence to show that the three-trade rule is not a valid indicator of whether it is reasonably foreseeable that a general contractor will be necessary to make the repairs; from presenting evidence in individual cases to show that it was not reasonably foreseeable that general contractors would have been necessary to make the repairs reflected on the estimates and to show that those particular insureds were not entitled to GCOP; and from presenting evidence in individual cases to show that, even if the three-trade rule applied, those particular estimates did not actually reflect that three or more trades would be involved in the repairs.
In fact, during the class-certification hearing, Thomas and Christopher both reviewed the estimates for DeWitt’s claim, and both testified that they did not think it was reasonably foreseeable that a general contractor would be required for the job and that they did not think that, as general contractors, they would take the job of repairing DeWitt’s mobile home. Also, both testified that general contractors did *381 not typically do repair work on mobile homes.
Also, during the hearing, Paxton testified that he had created a chart that could be used to convert the number of trade skills listed on an estimate to the number of trades that would be required to make the repairs. He also testified, however, that reasonable people educated in the field could look at the very same estimate and come up with different numbers of trades; that such subjectivity was “not good”; that, in using his chart, one could remove the subjectivity from the calculation; and that there was still subjectivity in creating the conversion chart. Paxton also applied the chart to DeWitt’s estimate and determined that making the repairs to the dwelling would involve five trades and that, if repairs to the storage building were included, six trades would be involved. However, Thomas testified that Paxton’s chart was arbitrary, and Thomas and Christopher both testified as to issues they had with some of the categorizations in Paxton’s chart. Thomas and Christopher also reviewed DeWitt’s estimate. Thomas testified that, based on the estimate, he saw only two trades and that, if he were to take on that job, he would hire only a roofer and a carpenter who had good handyman skills to perform the job. Christopher also testified that, if he were to take on DeWitt’s job, he would most likely hire two contractors for the job.
In Melot v. Oklahoma Farm Bureau Mutual Insurance Co., 87 P.3d 644 (Okla.Civ.App.2003), the Oklahoma Court of Civil Appeals affirmed an order certifying a class of policyholders of Oklahoma Farm Bureau Mutual Insurance Company (“Farm Bureau”) who alleged that Farm Bureau had not included GCOP in their payments for ACV or replacement costs and whose Farm Bureau worksheets or estimates indicated that three or more trades would be involved in making the repairs to the insured property. In Melot, the plaintiffs were proceeding on breach-of-contract, bad-faith, and fraud claims. The fraud claim was based on allegations that Farm Bureau had not informed the insureds of its practice of not including GCOP in such cases. In addressing the predominance issue, the Oklahoma Court of Civil Appeals noted:
“¶ 22 The trial court further defined the class as those whose damage adjustments by Insurer did not include ‘adequately calculated and timely tendered compensation’ for general contractor’s overhead and profit. The record discloses that Insurer’s records reveal whether payments to an insured did or did not include the 20 percent. Those who were not paid that amount would be part of the class; those who were would not be in the class.
“¶ 23 Again, on first blush, it would seem necessary to make individual inquiries here, into what is ‘adequate.’ In this regard, Insurer asserts that determining whether damage adjustments were adequately calculated depends on individualized questions of whether an insured was entitled to a payment for overhead and profit.
“¶ 24 Significantly, Insurer never asserts — and, the record does not indicate — that the question of whether the 20 percent charge should be included in settling a claim was resolved by Insurer after an individual assessment of each claim. To the contrary, Plaintiffs’ theories of recovery are based on the concept that Insurer followed an across-the-board pattern of failing to pay the 20 percent when three or more trades were involved, and that they are entitled to knowledge of and compensation for the charge, regardless of whether the result *382 ing repair costs included the 20 percent charge.
“¶ 25 We view the matter of whether Plaintiffs are entitled to the 20 percent charge as a question going to the merits of the lawsuit. Such an inquiry is inappropriate in deciding whether a class should be certified. Lobo Exploration v. Amoco Prod. Co., 1999 OK CIV APP 112, ¶ 14, 991 P.2d 1048, 1054. Put another way, a court cannot deny certification based on a belief that a plaintiff cannot prevail on the merits. Miller v. Mackey Intern., Inc., 452 F.2d 424, 427 (5th Cir.1971).
“¶ 26 Recently, in analyzing predominance and commonality, the Oklahoma Supreme Court quoted Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir.2001): ‘[Wjhere the lawsuit challenges a ... practice or policy that affects all of the putative class members ... individual factual differences among the individual litigants or groups of litigants will not preclude a finding of commonality.’ Ysbrand v. DaimlerChrysler Corp., 2003 OK 17, ¶ 21, 81 P.3d 618. Under the facts of this case, we believe this requirement was met.”
87 P.3d at 648-49.
Unlike the situation in Melot, however, National Security presented evidence during the class-certification hearing that it determined whether GCOP was to be paid on a case-by-case basis; that it paid GCOP when it was reasonably foreseeable that a contractor would be necessary in making the repairs to the insured property; and that in doing so it followed Alabama insurance-industry standards. As the Oklahoma Court of Civil Appeals noted, whether each individual member of the class would be entitled to GCOP is a question that goes to the merits of the action. However, based on the posture of this particular case, a resolution of those merits could potentially involve the presentation of evidence regarding the underlying facts of each class member’s insurance claim.
This case is also distinguishable from Press v. Louisiana Citizens Fair Plan Property Insurance Corp., 12 So.3d 392 (La.Ct.App.2009), in which the Louisiana Court of Appeals upheld the certification of a class of policyholders whose property was damaged during Hurricanes Katrina and/or Rita where the insurer’s “adjustment identified three or more trades involved in the repairs and payment was based on Citizens’s adjustment of damages; and the payment did not include 20% GCOP.” Press, 12 So.3d at 393-94. In that case the Louisiana Court of Appeals held that the common issue that predominated was whether the insured was entitled to GCOP when three or more trades were involved in making the repairs. However, the Louisiana Court of Appeals noted that, in that case, “the class members’ right to recover GCOP derives from the defendant’s systematic failure to follow its own policies and guidelines which set forth the requirement to pay GCOP at a flat rate of 20% when the insured’s adjustment identified three or more trades involved in the repairs.” Press, 12 So.3d at 396 (emphasis added). Therefore, it held that the predominance requirement had been satisfied. However, in this case, DeWitt does not allege that it was National Security’s policy to pay GCOP when three or more trades were involved. Rather, his action is based on allegations that National Security should pay GCOP when three or more trades are involved in making the repairs to the insured property.
In Burgess v. Farmers Insurance Co., 151 P.3d 92 (Okla.2006), a state district court had certified a class action in which the insureds were suing Farmers Insur- *383 anee Company, Inc. (“Farmers”), alleging breach of contract, bad faith, fraud, and deceit based on allegations that Farmers had systematically failed to pay GCOP and had withheld information regarding the insureds’ entitlement to such information. On appeal, the Oklahoma Court of Civil Appeals, holding that the district court had exceeded its discretion, reversed the district court’s judgment. The Oklahoma Supreme Court reversed the judgment of the Oklahoma Court of Civil Appeals and held that the district court had not exceeded its discretion in certifying the class. With regard to the Oklahoma Court of Civil Appeals’ holding on predominance, the Oklahoma Supreme Court noted that it was not appropriate to consider the merits of the claim when reviewing a class certification and that it would refrain from ruling on the merits of the three-trade rule because that was a question for the jury. It also stated:
“For this reason, we disagree with the [Court of Civil Appeals’] merits determination that ‘Farmers had no standardized rule’ as a basis for its conclusion that individualized assessments of each claim would be necessary in order to determine whether Insurer paid the proper amount under the insurance contract. Insurer’s assertion that the ‘three trade rule’ is invalid and/or that it did not operate pursuant to an objective standard in the payment of [GCOP] may still be raised ... at a trial on the merits, but it is inappropriate for us to determine its validity at this stage of the proceedings. If Insurer is successful on the merits on this issue and the jury rejects the Insureds’ assertions as to the Insurer’s alleged systematic underpayment of claims and failure to disclose information concerning the Insureds’ potential entitlement to such payments, then the result will be binding on the entire class of Insureds.
“As for Insurer’s argument that individual issues predominate over questions common to the class, we note that ‘[fjactual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory.’ Ysbrand v. Daimlerchrysler Corp., 2003 OK 17, ¶ 21, 81 P.3d 618, 627, cert. denied, 542 U.S. 937, 124 S.Ct. 2907, 159 L.Ed.2d 812 (2004) (citations omitted). Here, the acts or omissions of Insurer which constitute the alleged breaches of contract, bad faith and/or fraud (specifically, Insurer’s alleged systematic failure to pay [GCOP] at the time of ACV settlement when due and failure to disclose information to Insureds concerning [GCOP]) are the same or similar acts or omissions for each class member. Even though damages amounts may vary, common questions predominate where the acts or omissions are the same. See Black Hawk Oil Co. v. Exxon Corp., 1998 OK 70, ¶ 29, 969 P.2d 337, 345 (noting the mere possibility that plaintiffs’ proof on their fraud claims might fail is inappropriate grounds for denial of class certification in case involving alleged standardized misrepresentations to all members of the class); Lobo Exploration Co. v. Amoco Prod. Co., 1999 OK CIV APP 112, ¶ 10, 991 P.2d 1048, 1052, cert. denied (Okla.Sup.Ct., Nov. 10, 1999), cert. denied, 529 U.S. 1124, 120 S.Ct. 1996, 146 L.Ed.2d 821 (2000).”
In reaching our decision to vacate the class-certification order, we are not addressing the merits of DeWitt’s argument that National Security engaged in a standard practice of not paying GCOP in cases where a general contractor was not hired or the merits of National Security’s assertion that its policy was to pay GCOP when *384 it was reasonably foreseeable that a contractor would be necessary and that it determined whether to pay GCOP on a case-by-case basis. Nor do we address the merits of the three-trade rule. Rather, we base our determination on the fact that the litigation of these, issues will likely involve the presentation of evidence regarding numerous individual claims. Although this case will involve issues that are common to all class members, it is highly likely that it will also involve individualized evidence regarding whether it was reasonably foreseeable that the services of a general contractor would be necessary in each of those claims. Also, it is likely that the case will also involve evidence as to whether some of the estimates actually indicate that three or more trades would be involved in the repairs. Additionally, as the United States District Court for the Middle District of Florida noted in Mills, National Security would also be able to raise any affirmative defenses it might have against individual insureds. Finally, although De-Witt has presented a mechanical method for calculating the damages of each insured, as was the case in Mills an individual review of each claim file would still have to be undertaken to determine the damages in each case. We note that DeWitt did not present any evidence regarding the number of claims that might actually be included in the class definition. However, in his affidavit in support of National Security’s objection to class certification, Shiv-ley, the claims manager for National Security, stated:
“Since January 01, 2002 National Security has opened approximately 57,818 claim files (this includes 3 major hurricanes). We have closed approximately 51,242 claim files and have a current open inventory of 6,576 open claim files.”
Also, during the certification hearing, when Shivley was asked if there was a reason National Security could nbt make a computer copy of the images in its electronic files and give them to a third party to review, Shivley testified that that would involve between 30,000 and 40,000 files and that each file contained between 20 and 40 pages. Therefore, a class action in this case could potentially involve National Security’s presenting evidence regarding thousands of individual claims. Therefore, in this case, common questions of law and fact do not predominate.
B. Superiority
Even though we have concluded that common questions of law and fact do not predominate, pursuant to Rule 23(b)(3) DeWitt was also required to show that “a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” In its order granting class certification, the trial court stated:
“The four factors [in Rule 23(b)(3) ] all mitigate in favor of class certification. Relative to factor (A) concerning the interest of class members in bringing separate actions, the amounts due to each class member is relatively small. The Court finds that each class member would have little incentive to take an active part in prosecuting the case. Therefore, given the relatively small amounts due to the plaintiff and each class member, the litigation costs for a single insured challenging an across-the-board practice of an insurance company would be prohibitively high relative to the relief to which the insured would be entitled.
“As to factor (B) concerning similar litigation, the Court has not been made aware of any class action litigation pending against [National Security] regarding the payment of GCOP in Alabama. As to factor (C), Mobile County is a natural forum for this litigation. The *385 vast majority of the claims involved arose from Hurricanes Ivan and Katrina. The class is limited to Alabama citizens, and the class is limited to losses that occurred in Alabama. Therefore, the Court finds that most of the class members will be residents of either Mobile County or Baldwin County, and the losses concerned are concentrated in these two counties.
“As to factor (D) concerning manageability, National Security maintains an electronic database of its claims files, including each repair estimate prepared by its adjusters during the time period relevant to this case. The relevant estimates would be reviewed to see which ones indicated three or more trades but did not include GCOP. As [DeWitt’s] expert Albert Paxton testified, this is a relatively simple matter of counting. The Court agrees from examining the estimates for [DeWitt] that this is not a complicated task. According to Mr. Paxton, one may also take the list of the terms used to describe the various trades, which [DeWitt] submitted at the hearing, and review an estimate to see if three different trades are listed. Review of the files will also reveal the identity and addresses of the members of the class, so that notice of the class and an opportunity for opt-out may be afforded each class member under Ala. R. Civ. P. 23(c)(2), requiring such notice for any class certified under Rule 23(b)(3).
[[Image here]]
“The Court further finds that a class action is a superior method of adjudicating the class members’ claims. As shown above, it would not be economically feasible for each class member to individually litigate his or her claim. Furthermore, the appraisal process offered by National Security is not a superior method either as discussed in the next section.”
However, in Alfa Life Insurance Corp. v. Hughes, 861 So.2d 1088 (Ala.2003), this Court stated:
“Because individual issues predominate over the common claims, manageability difficulties render this case unfit for class certification. Reynolds Metals [Co. v. Hill], 825 So.2d [100] at 108 [ (Ala.2002) ]. ‘[T]he greater the number of individual issues, the less likely it is that a court may properly find that a class action is the superior means of litigating the plaintiffs claims.’ [Ex parte ] Green Tree[ Fin. Corp.], 723 So.2d [6] at 9 [ (Ala.1998) ]. The individualized inquiry necessary to determine the subjective facts in each transaction pretermits the superiority of any class-wide resolution of disputes.”
861 So.2d at 1103-04.
This case will potentially involve the introduction of evidence regarding thousands of individual claims. As was the case in Alfa, the necessity for such individualized inquiry outweighs the superiority of the class-wide resolution of disputes. Accordingly, this case is unfit for class certification. See Alfa, supra.
For these reasons, DeWitt has not satisfied his burden of establishing the predominance and superiority requirements set forth in Rule 23(b)(3), Ala. R. Civ. P. Therefore, the trial court exceeded its discretion in granting DeWitt’s motion for class certification.[9] Accordingly, we va *386 cate the trial court’s order granting class certification and remand this case for proceedings consistent with this opinion.
ORDER VACATED; CAUSE REMANDED.
MALONE, C.J., and STUART, PARKER, and SHAW, JJ., concur.

. Green Point Credit was the mortgagee for DeWitt's mobile home.

. The complaint alleged that National Security Group, Inc., was an insurance holding company "that had conducted business relevant to this complaint with [DeWitt] and putative class members through its wholly owned subsidiary, National Security Fire & Casualty Company. It also conducts business relevant to the class allegation of this complaint with the putative class members through Omega One Insurance Company, a wholly owned subsidiary of National Security Fire & Casualty Company.”

. The trial court's order contains a section on "National Security's Defenses,” which includes a discussion of "Appraisal,” "Overpayment/Set-Off,” and “Joinder of Mortgagees.” Because of our disposition of the class-certification issue under Rule 23, Ala. R. Civ. P., we have omitted that section.

. “This Court now phrases the question in terms of whether a trial court ‘exceeded’ its discretion, rather than whether the trial court ‘abused’ its discretion. The standard of review remains the same.” Classroomdirect.com, LLC v. Draphix, LLC, 992 So.2d 692, 701 n. 1 (Ala.2008).

. In Baldwin Mutual Insurance Co. v. Edwards, 63 So.3d 1268 (Ala.2010), Baldwin Mutual Insurance Company, Inc., appealed the circuit court's certification of a similar class. However, this Court did not address the Rule 23, Ala. R. Civ. P., requirements for class certification.

. Although "St. Paul Travelers Insurance Co.” is listed as the appellee in the style of this unpublished order, the order addresses only claims against Standard Fire.

“ 3 In Melot, the Oklahoma court affirmed certification of a class that presented the common question whether the insurer, in cases where it conceded that the insured's repairs involved three or more trades, was required to include an allowance for GCO & P in an ACV payment.”

. We note that, unlike Mills, the class definition in this case applied the three-trade rule rather than a “reasonably likely standard.” Therefore, some of the concerns presented in Mills are not present in this case.

. In fact, for purposes of § 34-8-1 et seq., Ala.Code 1975, "a ‘general contractor’ is defined to be one who, for a fixed price, commission, fee, or wage undertakes to construct or superintend or engage in the construction, alteration, maintenance, repair, rehabilitation, remediation, reclamation, or demolition of any building, highway, sewer, structure, site work, grading, paving or project or any improvement in the State of Alabama where the cost of the undertaking is fifty thousand dollars ($50,000) or more...." § 34-8-l(a), Ala.Code 1975.

. Based on our conclusion regarding the predominance and superiority requirements of Rule 23(b)(3), Ala. R. Civ. P., we pretermit consideration of the parties’ remaining arguments regarding the appropriateness of class certification in this case. See Wyeth, supra. We also pretermit discussion of the remaining claims raised by National Security and raised *386 in the amicus curiae brief filed by counsel for Property Casualty Insurers Association of America.